UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Valley National Bank,<br><br>           Plaintiff,<br><br>     v.<br><br>SLM Milledgeville, LLC; SLM Camilla, LLC; Senior Living Properties – Milledgeville, LLC; Senior Living Properties – Camilla, LLC; Uri Rubin; Dennis L. Wagner; Chuan S. Wang; and Andrew Hsu<br><br>           Defendants. | Civil Action 1:25-cv-3824 |

## **VERIFIED COMPLAINT**

Plaintiff Valley National Bank ("Plaintiff"), for its Verified Complaint against Defendants SLM Milledgeville, LLC ("SLM Milledgeville"); SLM Camilla, LLC ("SLM Camilla"); Senior Living Properties – Milledgeville, LLC ("Milledgeville Guarantor"); Senior Living Properties – Camilla, LLC ("Camilla Guarantor"); Uri Rubin ("Rubin"); Dennis L. Wagner ("Wagner"); Chuan S. Wang ("Chuan Wang"); and Andrew Hsu ("Hsu"), states as follows:

1. Defendants own and operate two senior living facilities in Georgia. Beginning in late 2024, Defendants became functionally insolvent. This insolvency led to the failure of Defendants to pay back Plaintiff's nearly five million dollar loan. The insolvency also highlights years-long failures of management at both senior facilities, which put the safety of residents at risk and jeopardize the value of Plaintiff's collateral.

## **THE PARTIES**

2. Plaintiff is a New Jersey Corporation. Its principal place of business is in Morristown, New Jersey. Plaintiff is successor by merger to Bank Leumi USA.

3. SLM Milledgeville is a limited liability company whose sole member is SLM Property Holdings, LLC. Upon information and belief, the only members of SLM Property Holdings, LLC are Rubin, Hsu, Chuan Wang, Wagner, and Roger Wang. Roger Wang is a natural person and, upon information and belief, Roger Wang is citizen of Florida. Thus, SLM Milledgeville is a citizen of Florida and California for diversity purposes.

4. SLM Camilla is a limited liability company whose sole member is SLM Property Holdings, LLC. Thus, SLM Camilla is a citizen of Florida and California for diversity purposes.

5. Milledgeville Guarantor is a limited liability company whose sole member is, upon information and belief, Senior Living Management Corp. ("Guarantor Owner"). Upon information and belief, Guarantor Owner is a Florida Corporation with its principal place of business in Florida.

6. Camilla Guarantor is a limited liability company whose sole member is, upon information and belief, Guarantor Owner.

7. Rubin is a natural person. Upon information and belief, Rubin is a citizen of Florida.

8. Chuan Wang is a natural person. Upon information and belief, Chuan Wang is a citizen of Florida.

9. Hsu is a natural person. Upon information and belief, Hsu is a citizen of California.

10. Wagner is a natural person. Upon information and belief, Wagner is a citizen of Florida.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff (which is a

citizen of New Jersey) and Defendants (which are citizens of Florida and California), and because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Defendants because Defendants agreed, in an agreement from which this action arises, to the personal jurisdiction of this District.

13. Venue is proper in this District because Defendants agreed, in an agreement from which this action arises, to venue in this District.

## FACTS

### The Parties' Agreements

14. On or about December 12, 2019, Plaintiff's predecessor-in-interest, Bank Leumi USA (the "Lender") made a loan to SLM Milledgeville and SLM Camilla (collectively, the "Borrowers") in the principal amount of $5,200,000 (the "Loan").

15. In connection with the Loan, on December 12, 2019, the Borrowers executed a promissory note in the principal amount of $5,200,000 (the "Note"). A true and correct copy of the Note is attached hereto as Exhibit A. The parties agreed that the Note is governed by New York law and, in Section 6.14 of the Note, the Borrowers agreed to be subject to the jurisdiction of this Court, and for venue to be laid in this District.

16. The Note provides that the Borrowers promised to pay the balance of the Loan "on or before (5) five years following the Effective Date (the "Maturity Date"). . . ." Thus, the Maturity Date of the Loan was December 12, 2024.

17. In connection with the Loan, on December 12, 2019, the Borrowers and the Lender executed a Loan Agreement. A true and correct copy of the Loan Agreement is attached hereto as Exhibit B. The parties agreed that the Loan Agreement is governed by New York law. In Section 12 of the Loan Agreement, the Borrowers agreed to the jurisdiction of this Court, and for venue to

be laid in this District.

18. To secure payment of the Loan and the Note, on or about December 12, 2019, the Borrowers executed and delivered to the Lender a Deed to Secure Debt, Assignment of Rents and Security Agreement (the "Deed"), which gave the Lender a security interest in the real properties commonly known as 61 Marshall Road, Milledgeville, GA 31061 (the "Milledgeville Property") and 161 E. Broad Street, Camilla, GA 31730 (the "Camilla Property") (hereinafter the "Properties"). A true and correct copy of the Deed is attached hereto as Exhibit C.

19. The Deed contains an unconditional assignment of rents.

20. The Deed also grants Lender a security interest in, among other things, Borrowers' accounts from which Loan payments are debited.

21. The Deed also provides, at Section 6.3(b), that the Lender "shall be entitled, upon application to a court of competent jurisdiction, to the immediate appointment of a receiver for all or any part of the Property and the Rents, whether such receivership may be incidental to a proposed sale of the Property or otherwise, and [Borrowers] hereby consent[] to the appointment of such a receiver and agree[] that such receiver shall have all of the rights and powers granted to Grantee herein."

22. The Deed also provides, at Section 6.3(f), that "upon the appointment of a . . . receiver as described above, . . . the receiver . . . may, at its sole option, (a) make all necessary or proper repairs and additions to or upon the Property, (b) operate, maintain, control, make secure and preserve the Property, and (c) complete the construction of any unfinished Improvements on the Property and, in connection therewith, continue any and all outstanding contracts for the erection and completion of such Improvements and make and enter into any further contracts which may be necessary, either in their or its own name or in the name of [Borrowers] (the costs

of completing such Improvements shall be expenses secured by this Deed to Secure Debt and shall accrue interest as provided in any instrument or agreement evidencing the Secured Obligations and if more than one rate of interest is applicable to the Secured Obligations, the highest rate shall be used for purposes hereof )."

23.  To secure payment of the Loan and the Note, the Lender and Borrowers caused a UCC Financing Statement (the "Financing Statement") to be filed on the land records where the Properties are located. The Financing Statement evidences Lender's security interests, in, inter alia, all of the accounts receivable arising from operations conducted at the Properties, as well as the inventory and equipment of the Borrowers. A true and correct copy of the Financing Statement is attached hereto as Exhibit D.

24.  The Borrowers also executed and delivered to Lender an Assignment of Leases and Rents which gave the Lender the right to all existing and future leases affecting the Properties and all Rents and all Proceeds from the sale or other disposition of the Leases, the Rents, and the Lease Guaranties. A true and correct copy of the Assignment of Leases and Rents is attached hereto as Exhibit E.

25.  Section 3.1 of the Assignment of Leases and Rents provides, among other things, that the Lender "may, at its option, . . . or by a receiver appointed by a court, . . . (iii) hold, manage, lease and operate the Property on such terms and for such period of time as [the Lender] may deem proper, [and] (iv) [the Lender], either with or without taking possession of the Property, in its own name, demand, sue for or otherwise collect and receive all Rents and sums due under all Lease Guaranties, including those past due and unpaid. . . ."

26.  The Assignment of Leases and Rents also provides, at Section 3.1, that "upon the occurrence of an Event of Default, [the Lender], at its option, may . . . (3) either require [the

Borrowers] to pay monthly in advance to [the Lender], or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in possession of [the Borrowers]. . . ."

27. To further secure the Loan and Note, on or about December 12, 2019, the Borrowers executed and delivered to the Lender an Assignment of Agreements Affecting Real Estate, which gave the Lender the right to "all of the rents, issues, income, revenue and profits due and becoming due" for certain "additional collateral," including but not limited to Leases for all or any portion of the Properties. A true and correct copy of the Assignment of Agreements Affecting Real Estate is attached hereto as Exhibit F.

28. In connection with the Loan, Rubin, Wagner, Chuan Wang, and Hsu (the "Individual Guarantors") each executed a Limited Guaranty dated December 12, 2019, guaranteeing the payment and performance of the obligations of the Borrowers to the Lender in connection with the Loan. A true and correct copy of the Limited Guaranty is attached hereto as Exhibit G.

29. In addition, Milledgeville Guarantor and Camilla Guarantor (the "Corporate Guarantors" and together with the Individual Guarantors, the "Guarantors") each executed an Unlimited Guaranty dated December 12, 2019, guaranteeing the payment and performance of all obligations of the Borrowers to the Lender in connection with the Loan. A true and correct copy of the Unlimited Guaranty is attached hereto as Exhibit H. The Limited Guaranty and the Unlimited Guaranty are hereafter referred to as the "Guaranties." The parties agreed that the Guaranties are governed by New York Law. In Section 26 of the Guaranties, the Guarantors agreed to the jurisdiction of this Court, and for venue to be laid in this District. The Guaranties are continuing, absolute, and unconditional guaranties of payment, not of collection. The

Guaranties also grant Plaintiff a security interest in the Guarantors' accounts at Plaintiff in order to secure Guarantors' obligations to Plaintiff under the Guaranties. The Guaranties, the Note, the Loan Agreement, the Deed, the Security Agreement, and the Assignment of Leases and Rents, are collectively referred to herein as the "Loan Documents."

30. Lender also extended a significant line of credit to Borrowers through its "OneCard" credit card program. This line of credit (the "Credit Card Facility") was extended in connection with the Loan.

<u>The Senior Living Facilities at the Properties</u>

31. The Corporate Guarantors are tenants of the respective Properties owned by the Borrowers. A true and correct copy of the Tenant Estoppel, Attornment and Subordination Certificate for the Lease Agreement between Lessee Senior Living Properties – Milledgeville, LLC, and Lessor SLM Milledgeville, LLC, is attached hereto as Exhibit I. A true and correct copy of the Tenant Estoppel, Attornment and Subordination Certificate for the Lease Agreement between Lessee Senior Living Properties – Camilla, LLC, and Lessor SLM Camilla, LLC, is attached hereto as Exhibit J.

32. Camilla Guarantor manages and operates a senior living facility at the Camilla Property, which is known as the Savannah Court of Camilla (the "Camilla Facility").

33. The Milledgeville Guarantor manages and operates a senior living facility at the Milledgeville Property, which is known as the Savannah Court of Milledgeville (the "Milledgeville Facility").

34. On or about December 22, 2011, the Borrowers and Corporate Guarantors entered into a Management Agreement (the "Management Agreement") for the management of the Milledgeville Facility and Camilla Facility.

35. In further connection with the Loan, on or about December 12, 2019, the Corporate Guarantors executed a Subordination of Management Agreement agreeing that the Management Agreement is "subordinate to the Loan and that upon default under the Loan[,] all sums due under the [Management] Agreement shall be fully subordinated to the Lender including, without limitation, the right to payment thereof until all sums due from Borrower to Lender (including, without limitation, the Loan and any interest rate hedge agreement) have been paid in full." A true and correct copy of the Subordination of Management Agreement is attached hereto as Exhibit K.

36. The Individual Guarantors are the principals of the Corporate Guarantors and are the individuals responsible for the safe and orderly operation of the senior living facilities at both of the Properties.

37. Over the past three years, the Defendants have failed to properly and safely operate the Camilla and Milledgeville Facilities. This has endangered the residents at such facilities and has put Plaintiff's collateral at risk.

38. For example, an October 7, 2024 inspection at the Milledgeville Facility by Georgia state inspectors revealed that the facility on that property did not meet Georgia's workforce qualifications and training requirements for senior facilities.

39. This was not the only recent issue identified in recent inspections. In July of 2024, state inspectors identified several problems at the Milledgeville Facility. These included the failure to conduct and/or keep records of staff criminal background checks and failure to conduct fire drills.

40. In recent years, Defendants have mismanaged the Milledgeville Facility in other concerning ways as well.

41. For example, in 2023, state inspectors found medication tracking issues at the

Milledgeville Facility.

42. They also found that a resident of the Milledgeville Facility was confined to their beds for long lengths of time and that the resident failed to receive care and services which were adequate, appropriate, and in compliance with applicable federal and state law and regulations.

43. Even worse, in 2022, state inspectors found that residents were sexually assaulting and/or harassing other residents at the Milledgeville Facility, and that the facility did not have staff or training adequate to prevent or address the assaults. Inspectors also found food safety issues at the Milledgeville Facility in 2022.

44. Defendants' operational failures are also on display at the Camilla Facility.

45. State inspectors found that at least one resident had absconded from the Camilla Facility without staff noticing.

46. State inspectors also found that the Camilla Facility did not have an appropriate memory care permit, nor did it have appropriately documented training for staff in first aid or infection control.

47. Moreover, upon information and belief, an additional reason that Defendants have failed to make payments on the Loan since October 2024 is because Defendants are paying monies to personal injury claimants for harms that occurred at the Properties and/or the Facilities.

48. Upon information and belief, Defendants do not have adequate or appropriate insurance which would cover such claims.

49. Such failure is a breach of Section 6.3(e) of the Loan Agreement, which requires Borrowers to maintain insurance "of the types and in amounts customarily carried in similar lines of business."

50. The foregoing operational issues at both facilities place Plaintiff's collateral at

significant risk, because the value of the Camilla and Milledgeville Properties depends on the amount of income that can be realized from them.

51. Where, as here, the facilities on the collateral properties are not properly run or adequately insured, they are less attractive to potential residents, thus leading to lower income.

52. This problem is evident at the moment, and is evidenced by the fact that SLM Milledgeville's accounts with Plaintiff show a negative balance of $488,894.64, as of April 30, 2025.

53. The functional insolvency of Guarantors is impacting, and has the potential to further impact, day-to-day life at the senior living facilities in Camilla and Milledgeville.

54. Based on the financial information of the Borrowers and Guarantors in the Plaintiff's hands, the senior living facilities lack sufficient cash flow to sustain proper operations.

55. The senior living facilities are the only occupants at each of the Properties.

56. As a result, the value of the Properties is closely tied to the quality of each of the senior living facilities.

57. Because of the foregoing, the value of Plaintiff's collateral for the Loan will be impaired if the Borrowers are permitted to continue to operate the senior living facilities at the Properties.

The Events of Default

58. On October 12, 2024, and November 12, 2024, the Borrowers failed to make payments on the Note. Each of these failures constituted an Event of Default under the terms of the Loan Documents.

59. The Borrowers also failed to pay the Balance of the Note at the Maturity Date. This, too, constituted an Event of Default under the terms of the Loan Documents.

60. Notice of the foregoing defaults was given to the Borrowers and the Guarantors.

61. Following such notice, the Borrowers failed to cure such defaults.

62. Following such notice, the Guarantors failed to cure such defaults.

63. Upon information and belief, Borrowers also defaulted by failing to maintain adequate insurance for the Properties.

64. Moreover, Borrowers' accounts with Plaintiff currently have a negative balance of over $488,894.64. This is because, under the terms of the Credit Card Facility, funds from Borrowers' accounts were applied to pay down the Credit Card Facility. This renders the security interests granted by Defendants worthless and further necessitates the dire need to adequately maintain the Properties as collateral.

## COUNT I
## BREACH OF CONTRACT

65. Plaintiff incorporates by reference and re-alleges the allegations set forth in the foregoing paragraphs as if fully stated herein.

66. The Note and Loan Agreement are valid, binding legal contracts, and the Borrowers are bound thereby.

67. The Borrowers' failure to timely make payments, and failure to repay the Loan after the Maturity Date, constitute Events of Default under the Note and the Loan Agreement.

68. Plaintiff has been damaged by the foregoing Events of Default in the amount of $4,867,221.80.00 plus fees and costs.

69. Moreover, the Borrowers' continued mismanagement of the senior living facilities at the Properties puts Plaintiff's collateral at risk of waste.

70. As a result of the foregoing, this Court should appoint a receiver for the Properties pursuant to the provisions of the Deed and the Assignment of Leases and Rents.

## COUNT II
## BREACH OF CONTRACT

71. Plaintiff incorporates by reference and re-alleges the allegations set forth in the foregoing paragraphs as if fully stated herein.

72. The Guaranties are valid contracts, binding on the Guarantors.

73. As set forth above, the Borrowers failed to make timely payments of the Loan, and failed to repay the Loan at the Maturity Date.

74. The foregoing constitutes an Event of Default under the Guaranties.

75. This Event of Default triggers the Guarantors' repayment obligations under the Guaranties.

76. The Guarantors have failed to repay Plaintiff as required by the Guaranties.

77. Plaintiff has been damaged thereby.

## COUNT III
## BREACH OF CONTRACT

78. Plaintiff incorporates by reference and re-alleges the allegations set forth in the foregoing paragraphs as if fully stated herein.

79. SLM Milledgeville entered into an agreement for the Credit Card Facility. That agreement is a valid and binding contract.

80. Plaintiff has performed all of its obligations under the foregoing agreement.

81. SLM Milledgeville has breached the foregoing agreement by failing to pay $488,894.64 as of the date of this complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. Adjudging and decreeing that the Borrowers and the Guarantors pay to Plaintiff

$4,867,221.80, which amount constitutes the outstanding balance of the Loan as of April 28, 2025;

b. Adjudging and decreeing that SLM Milledgeville pay to Plaintiff $488,894.64, which constitutes the negative balance in Borrowers' accounts with Plaintiff.

c. Appointing a receiver to take possession of, manage, receive income from, and sell the Properties;

d. Awarding Plaintiff pre-judgment and post-judgment interest on any monetary award made part of the judgment against Defendants; and

e. Awarding such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: May 7, 2025

**K&L GATES LLP**

By: */s/ Benjamin I. Rubinstein*

Benjamin I. Rubinstein
599 Lexington Avenue
New York, NY 10022
(212) 536-3900
benjamin.rubinstein@klgates.com

*Attorneys for Plaintiff*
VALLEY NATIONAL BANK

## VERIFICATION

I, Daniel Sheesley, declare as follows:

1. I am the Senior Vice President of Valley National Bank ("Valley National Bank").

2. I have review the foregoing Verified Complaint.

3. I have personal knowledge of the allegations in the foregoing Verified Complaint.

4. The allegations in the Verified Complaint are true and correct to the best of my knowledge, except as to those matters stated "upon information and belief," and as to those matters, I believe them to be true.

5. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on: May 7, 2025

*Daniel Sheesley*
Daniel Sheesley
Senior Vice President,
Valley National Bank